IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| 3D TECHNOLOGY GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:23-cv-01278 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| WILLIAM MARTINEZ, | ) | |
| MICHAEL MARTINEZ, and | ) | |
| DATA SOURCE TECHNOLOGY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

3D Technology Group, LLC[1] ("Plaintiff") initiated this lawsuit by filing a complaint in this Court on December 5, 2023. (Doc. No. 1). Defendants William Martinez ("W. Martinez"), Michael Martinez ("M. Martinez"), and Data Source, Technology, LLC ("Data Source"), (collectively, "Defendants") collectively filed a "Motion to Dismiss" (Doc. No. 25, "First Motion to Dismiss"), and Plaintiff thereafter filed a first amended verified complaint (Doc No. 40, "FAC"). The FAC became the operative complaint in the case, and this Court accordingly denied Defendant's First Motion to Dismiss as moot (Doc. No. 43).

Now pending before the Court is Defendants' "Motion to Dismiss [the FAC]" (Doc. No. 45, "Motion"), wherein Defendants seek dismissal of this action under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Motion is supported by a memorandum of law (Doc. No. 46, "Memorandum"). Plaintiff filed a response (Doc. No. 54, "Response") in opposition to the Motion, to which Defendants filed a reply (Doc. No. 57, "Reply").

---

[1] The Court is aware that 3D Technology was acquired by Ovation Health and that as a result, Defendants in their Memorandum have opted to refer to Plaintiff as "Ovation Health." (Doc. No. 46 at 1 n.1). However, the Court will continue to refer to Plaintiff as "3D" where appropriate.

For the reasons stated herein, the Motion will be GRANTED and this action will be dismissed in an accompanying order.

BACKGROUND[2]

Plaintiff is an information technology professional services company, primarily serving healthcare customers. (Doc. No. 40 at ¶ 14). On February 9, 2016, Plaintiff hired Defendant W. Martinez.[3] (*Id.* at ¶ 19). On the same day, W. Martinez signed a Non-Compete, Non-Solicitation and Confidentiality Agreement ("Agreement"). (*Id.* at ¶ 20). Paragraph[4] 9 of the Agreement comprises what the FAC, and the Court herein, calls the "Restrictive Covenant".[5] The Restrictive Covenant states the following:

---

[2] The facts herein are taken from the FAC, which is the operative complaint in this case. For purposes of the instant Motion, the facts in the FAC are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[3] At the time that Plaintiff hired W. Martinez, Plaintiff was owned by W. Martinez's brother, C. Martinez (who is not a defendant in this case). (Doc. No. 40 at ¶ 19).

[4] The Court uses the term "Paragraph" where Plaintiff uses the term "Section."

[5] The Agreement also contained a non-disclosure covenant in Paragraph 7, which provided:

> 7. **DISCLOSURE OF INORMATION** – The **EMPLOYEE** recognizes that the methods utilized by **3-D Technology** in the conduct of its business are valuable, special and unique assets of **3-D Technology**. The **EMPLOYEE** will not during the term of this Agreement or for a period of one (1) year thereafter disclose any such method or any part thereof to any person, firm, corporation or other entity for any reason or purpose whatsoever.

(Doc. No. 40-2 at ¶ 7). Notably, whereas the non-disclosure covenant in Paragraph 9 is merely part of Paragraph 9, the non-disclosure covenant of Paragraph 7 is the entirety of Paragraph 7. This matters because (as is relevant below) it is not possible to allege a breach of Paragraph 7 without alleging a breach of a non-disclosure covenant (and in particular the non-disclosure covenant of Paragraph 7 rather than the non-disclosure covenant in Paragraph 9).

At times, the parties seemingly blur Paragraph 7 with Paragraph 9 and/or treat Paragraph 7 as being part of the Restrictive Covenant. But to be clear, the "Restrictive Covenant" referred to in the FAC is *Paragraph* 9 (and only *Paragraph* 9) of the Agreement, Plaintiff makes clear in both the FAC and its Response. (Doc.

9. **RESTRICTIVE COVENANT** – It is understood and agreed that the nature of the methods employed by 3D Technology's business is such that the **EMPLOYEE will be placed in a close business and personal relationship with the clients of 3D Technology**. Thus, during a period of twelve (12) months following termination of employment, the **EMPLOYEE** shall not directly or indirectly, own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of, any business which competes with **3D Technology**; in addition to the above, if the **EMPLOYEE** held an executive position with 3D Technology the **EMPLOYEE** further agrees not to perform or provide any services which are similar to the duties performed by **EMPLOYEE** within the last six months of the **EMPLOYEE'S** employment with 3D Technology to any individual or business(es) which is engaged in the type of business(es) similar to the type of business(es) conducted by **3D Technology.** This covenant is given by the **EMPLOYEE** as part of the consideration of this Agreement. The **EMPLOYEE** further agrees not to solicit, divert or influence or attempt to solicit, divert, or influence any client or employee of **3D Technology** in any manner detrimental to the interests of **3D Technology** and shall not divulge the names of **3D Technology** clients or employees to a competitor or potential competitor of **3D Technology** during a period of one (1) year following termination.

(Doc. No. 40-2 at ¶ 9) (emphasis original).

On February 5, 2018, Plaintiff promoted W. Martinez to Director of Field Operations for HCA Healthcare, a client of Plaintiff whose services constituted approximately twenty percent of Plaintiff's revenue from 2021 to 2023. (Doc. No. 40 at ¶¶ 18, 26-27). On November 15, 2022, Plaintiff terminated W. Martinez's employment.[6] (*Id.* at ¶ 28). Slightly more than one year later, on November 16, 2023, several of Plaintiff's employees were copied on an email from HCA implying that HCA Healthcare would soon be transferring its business from Plaintiff to "W. Martinez of Data Source." (*Id.* at ¶ 29). Shortly thereafter, HCA Healthcare notified Plaintiff that it was terminating its business relationship with Plaintiff and would be working with W. Martinez

---

No. 40 at ¶ 32). This should come as no surprise, since Paragraph 9 is captioned, "Restricted Covenant," and is the only part of the Agreement captioned, "Restrictive Covenant."

[6] Defendant W. Martinez was terminated by Plaintiff on November 15, 2022, after Plaintiff discovered W. Martinez had embezzled funds from Plaintiff. (Doc. No. 40 at ¶ 28). Defendant W. Martinez previously moved this Court to stay these proceedings given that his criminal case remains pending. (Doc. No. 27). This Court has since denied Defendant W. Martinez's motion to stay. (*See* Doc. No. 96).

and his new employer, Data Source, which "had been doing work for HCA Healthcare several months prior" to November 16, 2023. (*Id.* at ¶ 30). Plaintiff thereafter learned that W. Martinez's brother, M. Martinez (who had previously worked at 3D), had organized Data Source as a Florida limited liability company on January 1, 2023.[7] (*Id.* at ¶ 34-35).

Plaintiff essentially alleges that based on the surrounding timeline concerning HCA Healthcare's transfer of its business to Data Source, W. Martinez violated the terms of his February 9, 2016, contract by unlawfully working with his brother, M. Martinez, to persuade HCA Healthcare to transfer its business from Plaintiff to Data Source, a move estimated to have cost Plaintiff approximately $4,675,000 in lost revenue in 2024. (*Id.* at ¶¶ 29-32).[8]

Plaintiff seeks relief on five counts ("Counts I-V"). Count I is for breach of contract against W. Martinez; Count II is for tortious interference with contract against M. Martinez and Data Source; Count III is for tortious interference with business relations against W. Martinez, M. Martinez, and Data Source; Count IV is for civil conspiracy to misappropriate confidential information against W. Martinez, M. Martinez, and Data Source; and Count V is for Unfair competition against W. Martinez, M. Martinez, and Data Source. Plaintiff seeks a preliminary and permanent injunction, as well as damages, costs, and interests. (*Id.* at 15).

---

[7] Plaintiff previously employed Defendant M. Martinez from December 31, 2017, until November 30, 2019. Plaintiff alleges that the employment contracts (with 3D) for M. Martinez and W. Martinez were identical to one another, (Doc. No. 40 at ¶ 35), and therefore "M. Martinez was aware that W. Martinez's solicitation of HCA Healthcare would violate his employment agreement, and that his inducement of such violation was wrongful." (*Id.* at ¶ 36). The Court notes that the latter proposition follows from the former proposition (which the Court accepts as true for purposes of the Motion) only if M. Martinez knew that his employment contract with 3D was identical to W. Martinez's employment contract with 3D. The Court takes no position on the validity of the latter proposition because it does not directly bear on the Court's analysis below.

[8] Specifically, Plaintiff argues that the Restrictive Covenant's twelve-month prohibition of working for a competitor began upon W. Martinez's termination on November 15, 2022. (Doc. No. 40 at ¶ 32). HCA Healthcare notified Plaintiff that it had been working with W. Martinez and Data Source "several months" prior to the November 16, 2023, email, which Plaintiff takes to mean that W. Martinez must have violated the terms of the Restrictive Covenant during the twelve-month post-termination period (as the work must have started at some point during that twelve-month period). (Doc. No. 40 at ¶¶ 29-33).

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in a complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 167 L.Ed.2d 929 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id.* at 681. The question is whether the remaining allegations—factual

allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652–53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791–92 (M.D. Tenn. 2018).

DISCUSSION

1. <u>Choice of Law</u>

As a preliminary matter, Defendants correctly point out that because this case was filed in federal court under diversity of citizenship jurisdiction, it "must apply the choice-of-law rules of the state in which it sits." *Mahne v. Ford Motor Co.*, 900 F.2d 83, 85 (6th Cir. 1990) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). Tennessee "follows the rule of *lex loci contractus* [which] provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014). Defendants argue that Plaintiff's causes of action are for breach of contract or torts generally relating to breach of contract, and that the legally significant actions of the parties might imply that Florida law, rather than Tennessee law, controls these issues. (Doc. No. 46 at 7-16). Thus, Defendants urge this Court to conduct a robust choice of law analysis before ruling on its Motion. (Doc. No. 46 at 16).

The Court declines to conduct such a choice of law analysis at this time. When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court will consider only matters pled within the four corners of the complaint. *See Caraway v. CoreCivic of Tennessee, LLC*, 98 F.4th 679, 682 (6th Cir. 2024) ("Ordinarily, courts evaluate the sufficiency of a claim based only on the four corners of the complaint."). Defendants proffer, extrinsic to the FAC, that Florida is "the location where [W. Martinez] would have executed any such Agreement [at issue in the case], if the proof establishes that he actually did so." (Doc. No. 46 at 9). Defendants thus imply that Florida law may control concerning the contractual issues in this case. But the Court will not consider this speculation for purposes of Defendants' Motion, as the assertion clearly falls outside the four corners of the FAC.[9]

Further, the Court declines to conduct a robust choice of law analysis at this time because it lacks the evidentiary support required to engage in such a measure. As other courts have held at the motion-to-dismiss stage, "the record is insufficient to determine precisely where the injury-causing conduct occurred. It is also impossible to determine precisely where the parties' relationship was centered. Accordingly, the Court cannot properly conduct a conflict-of-laws analysis at this time." *Am. Home Assur. Co. v. Weaver Aggregate Transp., Inc.*, 773 F. Supp. 2d 1317, 1323 (M.D. Fla. 2011).

Thus, at this stage of the proceedings, the Court will construe as true the well-pleaded allegations in the FAC in the light most favorable to Plaintiff. Though Plaintiff did not explicitly state in the FAC that Tennessee law controls (and would not be expected to make any sort of

---

[9] Defendants rely on the "Declaration of Bill Martinez" (Doc. No. 33-1) in order to make this point. (Doc. No. 46 at 9). Yet, as referenced, this is information outside of the FAC and is therefore inappropriate for the Court to consider at this time. Further, Defendants have not moved to convert their Motion to a motion for summary judgment, nor have they suggested that the Court treat the Motion as one for summary judgment pursuant to Rule 12(d). *See* Fed. R. Civ. P. 12(d).

statement about choice-of-law), the FAC strongly implies that Plaintiff intended for Tennessee substantive law to apply.[10] Therefore, for the purposes of Defendants' Motion, the Court will evaluate the plausibility of Plaintiff's claims as those claims exist under Tennessee law.[11]

2. Sufficiency of Plaintiff's Claims

a. Count I

Plaintiff has claimed breach of contract against Defendant W. Martinez in Count I of the FAC. The contractual provision at issue is the Restrictive Covenant, i.e., Paragraph 9 of the Agreement.[12] As noted above, Paragraph 9 states the following:

> **RESTRICTIVE COVENANT** – It is understood and agreed that the nature of the methods employed by 3D Technology's business is such that the **EMPLOYEE** will be placed in a close business and personal relationship with the clients of **3D Technology**. Thus, during a period of twelve (12) months following termination of

---

[10] Plaintiff references Tennessee state law in its prayer for relief under T.C.A. § 47-50-109. (Doc. No. 40 at ¶ 16). Plaintiff is also a Tennessee liability company with principal offices in Williamson County, Tennessee and the FAC pleads that venue was proper in this district because "a substantial part of the events or omissions given [sic] rise to 3D's claims occurred in this judicial district." (Doc. No. 40 at ¶¶ 3, 8-10).

The Court discerns that if anything, application of Tennessee law favors Plaintiff (which may explain why Plaintiff implies that Tennessee law applies). In particular, on the one issue on which the Court perceives the difference in the two states' law as at least potentially material—i.e., whether Plaintiff needs to identify trade secrets with particularity to support some of its claims—Tennessee law may be more lenient towards Plaintiff than is Florida law.

[11] To this effect, the Court will deny Defendants' "Second Motion to Transfer" (Doc. No. 47) and "Motion to Determine Applicability of Florida Law" (Doc. No. 59) as moot in the order accompanying this opinion.

[12] Count I explicitly mentions Paragraph 7 of the Agreement. Nevertheless, it cannot reasonably be construed to allege a breach of Paragraph 7. As noted in a footnote above, it is not possible to allege a breach of Paragraph 7 without alleging a breach of a non-disclosure covenant, and in particular the non-disclosure covenant of Paragraph 7—something that Count I does not do. While Count I does refer in paragraph 43 of the FAC to breaches based on "conveying confidential information to Data Source," the breach is allegedly of "the non-compete and non-solicitation terms of the Agreement during the 12-month term of the Restrictive Covenant set out in the Agreement," (Doc. No. 40 at ¶ 43), thus implicating solely the Restrictive Covenant (Paragraph 9) rather than Paragraph 7; moreover, Paragraph 7 cannot be implicated here anyway because it contains no "non-compete [or] non-solicitation terms." And likewise, although Count I does refer in paragraph 44 of the FAC to breaches based on "divulging [unspecified confidential] information to Data Source," (id. at ¶ 44), the breach is allegedly of "the non-compete term of his Agreement," (id.), which means Paragraph 9 rather than Paragraph 7. So no breach of Paragraph 7 is alleged in Count I. This means that Count I cannot survive based on the idea (the validity of which is debatable for reasons into which the Court need not delve herein) that Paragraph 7 is enforceable even if Paragraph 9 is not—an argument that Plaintiff has not made anyway.

employment, the **EMPLOYEE** shall not directly or indirectly, own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of, any business which competes with **3D Technology**; in addition to the above, if the **EMPLOYEE** held an executive position with 3D Technology the **EMPLOYEE** further agrees not to perform or provide any services which are similar to the duties performed by **EMPLOYEE** within the last six months of the **EMPLOYEE'S** employment with 3D Technology to any individual or business(es) which is engaged in the type of business(es) similar to the type of business(es) conducted by **3D Technology.** This covenant is given by the **EMPLOYEE** as part of the consideration of this Agreement. The **EMPLOYEE** further agrees not to solicit, divert or influence or attempt to solicit, divert, or influence any client or employee of **3D Technology** in any manner detrimental to the interests of **3D Technology** and shall not divulge the names of **3D Technology** clients or employees to a competitor or potential competitor of **3D Technology** during a period of one (1) year following termination.

(Doc. No. 40-2 at ¶ 9) (alterations in original). Notably, the Restrictive Covenant actually contains not only a covenant not to compete (also known as a "non-compete" or "restrictive covenant"), but also a covenant not to solicit clients and employees and a covenant not to disclose certain information (which should not be confused with the non-disclosure covenant of Paragraph 7).

"In general, covenants not to compete are disfavored in Tennessee. . . [t]hese covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). Furthermore, even in cases where a restrictive covenant protects a legitimate business interest, the "time and territorial limitations" contained therein still must be deemed reasonable in order for the covenant to be enforceable. *Id.*; *Colombus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 384 (Tenn. Ct. App. 2009) ("the time and territorial limits involved must be no greater than necessary to protect the business interest of the employer."). Thus, a restrictive covenant is subject to a reasonableness-of-scope analysis.

This Court not long ago conducted such an analysis in *Thunder Roads Mag./Thunder Publ'g, LLC v. Smith*, 2023 WL 8532696 (M.D. Tenn. Dec. 8, 2023) (Richardson, J.).[13] In that case, the non-compete provision restricted the defendant from competing with the plaintiff in "any state, city, county or country," which this Court construed to mean "anywhere on the planet." *Thunder Roads*, 2023 WL 8532696 at *9. This Court found that provision unenforceable because it did "not contain a reasonable geographical limitation," especially when compared to *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361 (Tenn. 1966) (the Tennessee Supreme Court case cited by the defendant in *Thunder Roads*) which struck down a non-compete provision that prohibited an employee from competing in any city in which the plaintiff operated. *Id.* at *9. ("In fact the [provision's] territorial limitation can hardly even be described as a limitation.").

Paragraph 9 unambiguously does not include any territorial limitation whatsoever. The Restrictive Covenant makes clear that Defendant W. Martinez "shall not directly or indirectly, own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of, any business which competes with 3D Technology" within one year of termination of his employment at 3D. (Doc. No. 40-2 at ¶ 9). This essentially forbids him from working for a competitor "anywhere on the planet." *Thunder Roads*, 2023 WL 8532696 at *9.[14] The Restrictive Covenant, like the non-compete provision in *Thunder*

---

[13] Herein, the Court uses the term "non-compete provision" interchangeably with "restrictive covenant." A third term for the same thing is, as indicated above, "covenant not to compete."

[14] Though it was not argued by Plaintiff in its Response, the Court notes that the Tennessee Supreme Court has quoted with apparent approval the following regarding geographical restrictions of non-compete provisions: "Area limitations are reasonable if restricted to the area in which the employee was engaged in the course of his employment; but, *unless trade secrets are involved*, [a] covenant restricting an employee beyond the area of his former operations is invalid, even though the employer's business extends throughout the area designated." *Allright Auto Parks*, 409 S.W.2d at 364 (emphasis added) (quoting 17 C.J.S. Contracts § 254, p. 1148). The Court's research has not revealed Tennessee case law indicating what exactly it means for "trade secrets to be involved" so as to make applicable this exception to the rule that a restrictive

*Roads,* is "unreasonable and therefore unenforceable" on this basis. *Allright Auto Parks*, 409

S.W.2d at 365.[15] Count I is accordingly dismissed.

---

covenant is invalid if the restriction extends beyond the area of the employee's former operations. But it stands to reason that it means that the restrictive covenant itself indicates that it is prompted at least in part by the contemplation that the employee will gain access to trade secrets of the employer during the course of the employment.

   The Court finds that the Restrictive Covenant does not indicate that it was prompted by the contemplation that *trade secrets*—as opposed to mere "names of 3-D Technology clients or employees," (Doc. No. 40-2 at ¶ 9), which are not necessarily things that rise to the level of trade secrets—would be disclosed by Plaintiff to W. Martinez in connection with his employment. The only direct mention of trade secrets in the Agreement is in Paragraph 3. (*See* Doc. No. 40-2). But Paragraph 3 is not part of the Restrictive Covenant. Therefore, the Court declines to transpose the contemplation of trade secrets into the Restrictive Covenant, especially given that under Tennessee law language in a contract is construed against the drafting party (in this instance, Plaintiff). *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 153 (1968) (endorsing the "rule of interpretation that language used in a contract will be construed most strongly against the party who has used it.") (quotations and citations omitted). This interpretation is further reinforced by the principle, discussed above, that "covenants not to compete are disfavored in Tennessee. . . [t]hese covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). Further, the Court is less inclined to find that the Restrictive Covenant was prompted by trade secrets because, after all, Plaintiff did not argue for this exception; it was the Court, conducting its own research, that found the exception that could potentially could (but actually does not) apply in this case. Accordingly, although Plaintiff has alleged that W. Martinez acquired confidential information that "was unique and constituted valuable trade and business secrets," (Doc. No. 40 at ¶ 22), the Court does not find this sufficient to trigger the trade-secret-based exception to which the Tennessee Supreme Court alluded in *Allright Auto Parks*.

[15] The Court also declines Plaintiff's suggestion to "modify" the Agreement so as to make it reasonable and therefore enforceable. True, judicial modification of non-compete provisions (so-called "blue penciling") is allowed. *See Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28 (Tenn. 1984) (holding that courts may employ the rule of reasonableness to modify non-compete provisions of contracts). But the Court chooses not to do so in this instance. Regarding modification, Plaintiff argues only that the "temporal restriction of one year" contained within the Restrictive Covenant should be deemed reasonable, or that if it is not, it should be modified by the Court to be reasonable. But Plaintiff does not adequately argue that the Court should modify the *geographical limitations* (or lack thereof) in the Restrictive Covenant. Plaintiff cites a case that happened to modify a geographical restriction (Doc. No. 54 at 13-14) but otherwise does not purport to apply it to this case and does not otherwise support (or even address at all) possible blue-penciling as to geographical restrictions. Given this omission and the Restrictive Covenant's complete absence of a geographical limitation (as opposed to an express inclusion of one that turns out to be overbroad), the Court lacks any direction in re-drafting the non-compete for Plaintiff in order to make it reasonable. Accordingly, the Court finds that it should not shoulder the task of re-drafting the contract for Plaintiff to make it enforceable, and accordingly rejects Plaintiff's underdeveloped suggestion to modify the Agreement in order to make it reasonable and thus enforceable.

b.  Count II

Count II consists of Plaintiff's claim of tortious interference with contract against Defendant M. Martinez and Data Source for "intentionally inducing the breach of William Martinez' Restrictive Covenant." (Doc. No. 54 at 15). The core of this claim is that M. Martinez and Data Source were aware of the Restrictive Covenant because M. Martinez (who was working for Data Source at the time the breach allegedly occurred) had previously been employed by 3D and therefore had signed an "identical agreement during the course of [that] employment." (Doc. No. 40 at ¶ 50). It is clear from the face of the FAC that the contract in question is the "Restrictive Covenant in the Agreement." (*Id.* at ¶ 49). Notably, Count I cannot reasonably be construed as being based on interference with any part of the Agreement other than the Restrictive Covenant.

The first element of a claim for tortious interference with contract is that "a legal contract existed." *Givens v. Mullikin ex rel. Est. of McElwaney*, 75 S.W.3d 383 at 405 (Tenn. 2002). As the previous analysis of the breach-of-contract claim in Count I makes clear, however, the Restrictive Covenant is unenforceable and therefore a legal contract (i.e., a legally enforceable contract) did not exist specifically with respect to the content of the Restrictive Covenant on which Count II is based. Accordingly, Plaintiff's claim that M. Martinez and Data Source tortiously interfered with the Restrictive Covenant (the only part of the Agreement implicated by this claim) fails, as there is not a specific legal contract underlying this claim. Accordingly, this claim is dismissed.[16]

c.  Count III

Count III consists of Plaintiff's claim of tortious interference with business relations against all Defendants. Plaintiff alleges that Defendants "intentionally interfered with the

---

[16] The Court declines to conduct a preemption analysis as to this claim because (as stated above) even if the claim were indeed not preempted by Tennessee Uniform Trade Secrets Act, it would clearly fail to satisfy the elements of the cause of action.

relationship between 3D and HCA Healthcare." (Doc. No. 40 at ¶ 56). Plaintiff further alleges that "Data Source employed [] improper means, beyond ordinary competition, to interfere with this business relationship," which included "1) inducing W. Martinez to breach the Restrictive Covenant in his Agreement with 3D; and 2) inducing W. Martinez to use his close relationship with HCA Healthcare, which developed over many years, and his access to trade secrets and Confidential Information of 3D, to unfairly compete with 3D."[17] (*Id.* at ¶ 57).

Defendants assert that the Tennessee Uniform Trade Secrets Act ("TUTSA") preempts all of Plaintiff's common-law claims, including the claim in Count III. (Doc. No. 46 at 27). "TUTSA displaces 'conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.'" *Cardinal Health 414, Inc. v. Adams,* 582 F. Supp. 2d 967, 984 (M.D. Tenn. 2008) (Trauger, J.) (quoting Tenn. Code Ann. § 47-25-1708(a)). In *Cardinal Health* Judge Trauger agreed with the reasoning in *Hauck Manufacturing Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649 (E.D. Tenn. 2004), which found that courts should employ the "same proof" test when analyzing common law claims to determine whether they should be preempted by TUTSA. Under the "same proof" test:

---

[17] The Court notes that although Count III contains a claim against all Defendants, the FAC seemingly focuses on "Data Source's actions." (Doc. No. 40 at ¶ 57). As the language quoted above makes clear, the FAC alleges that "Data Source employed [] improper means . . . to interfere with this business relationship" and that Data Source "induc[ed] W. Martinez . . . to breach the Restrictive Covenant" and "induc[ed] W. Martinez to use his close relationship with HCA Healthcare . . . to unfairly compete with 3D." (*Id.*). The FAC does not allege that M. Martinez was responsible for these actions of Data Source (even though it does allege that M. Martinez is the "single member" of Data Source), (*see id.* at ¶ 58), and the Court is hesitant to infer such responsibility. And the Court is further hesitant to construe the allegations as focusing on the behavior of W. Martinez, as the language suggests that the alleged wrongdoing underlying this count is the *inducement by Data Source* of W. Martinez's behavior, not W. Martinez's behavior itself. (*Id.*) The last sentence of Count III suggests this when it states, "As a direct and proximate result of *Data Source's* actions, 3D has been damaged[.]" (*Id.* at ¶ 58) (emphasis added). Therefore, the Court finds that these allegations really focus on just the actions of Data Source, and not the other two Defendants named in Count III. Therefore, it is possible that liability of the two individuals on this claim has not plausibly been suggested by factual matter in the Complaint—either within Count III or in the prior allegations that were incorporated therein. But the Court need not decide whether that is the case.

a claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have misappropriated a trade secret . . . if proof of a non-[T]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted. . . .

*Cardinal Health*, 582 F. Supp. 2d at 985 (citing *Hauck*, 375 F. Supp. 2d at 658) (alteration in original). Judge Trauger further explained that "the key challenge in analyzing the scope of UTSA preemption is determining what civil claims beyond, obviously, common law trade secret misappropriation are preempted." *Id.* at 984. The undersigned has recently endorsed the "same proof" standard. *See 1900 Market LLC v. Omnia LLC*, No. 3:23-CV-00954, 2025 WL 2382936 at *9 (M.D. Tenn. Aug. 15, 2025) (Richardson, J.) ("Given the extent of concurrence within the district, the state, and the circuit, this Court herein will apply the 'same proof' standard—not least because the Court is confident that this approach comports with the *Erie* doctrine."). The Court will therefore apply the same proof test, and that:

> when it says it will apply the "same proof" test, it means it. Herein, a claim will be ruled preempted, if at all, based only on the 'same proof' test; perhaps contrary to what some courts (even if seemingly applying the "same proof" test) have done, it will not find a claim preempted merely on some more general notion that the claim somehow *involves* or *is related to* trade secrets (or other information protected by TUTSA).

*Id.* at *9 (Richardson, J.) (emphasis original).

Turning to the instant case, Defendants assert that Plaintiff's claim in Count III is preempted by TUTSA because the allegations directly implicate the "trade secrets and Confidential Information of 3D," which were used "to unfairly compete with 3D." (Doc. No. 40 at 13). Accordingly, Defendants argue, proof of this claim would necessarily rise and fall on whether Defendants are found to have misappropriated a trade secret. (Doc. No. 46 at 31).

Plaintiff counters by arguing that the none of the elements of the claim actually require proof of the misappropriation of trade secrets. The elements of the claim are as follows:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means . . . ; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc., v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Plaintiff contends that, for this claim, "[a]ll that is needed is proof is [sic] that these Defendants interfered with that relationship by using 'improper motive or improper means.'" (Doc. No. 54 at 18). And Plaintiff posits that it can establish "improper means" on the part of Defendants that are separate and independent from the misappropriation of trade secrets. Specifically, Plaintiff identifies two such improper means "(1) inducing W. Martinez to breach the restrictive covenant in his agreement with 3D and (2) inducing [W.] Martinez to use his close relationship with HCA Healthcare which has developed over many years." (Doc. No. 54 at 19). In summary, Plaintiff is arguing that the claim can survive TUTSA preemption because the basis for the claim is not the misappropriation of trade secrets.

The Court agrees with Plaintiff's argument. As for the first of the two alleged improper means whereby Defendants interfered with the business relationship between Plaintiff and HCA Healthcare, the Restrictive Covenant does not expressly implicate trade secrets. (*See* Doc. No. 40-2 at ¶ 9). It follows, just as Plaintiff argues, that inducing W. Martinez to breach the Restrictive Covenant does not implicate trade secrets, so the claim "does not stand or fall upon whether Defendants misused or misappropriated 3D's trade secrets." (Doc. No. 54 at 19). Therefore, the inducement of the breach of the Restrictive Covenant could in fact constitute a non-trade-secret basis for establishing element four of Plaintiff's claim. In this sense, the Court finds that this claim

would not be preempted by TUTSA, as the claim would not in fact "rise or fall" based on whether one or more Defendants is found to have misappropriated a trade secret.

Unfortunately for Plaintiff, however, this does not mean that Count III survives. The fourth element of the claim requires the "defendant's intent to cause the breach or termination of the business relationship" and "improper motive or improper means." *Trau-Med*, 71 S.W.3d at 701. Plaintiff seemingly argues that Data Source's inducement of W. Martinez's breach of the Restrictive Covenant constituted this "improper means." *Id.* As previously discussed, however, this Court finds the Restrictive Covenant to be unreasonable and unenforceable. Accordingly, the underlying activity that forms the basis for the claim under Plaintiff's rationale does not actually satisfy the fourth element of the claim. The Restrictive Covenant is unenforceable and therefore a violation of it cannot constitute the "improper means" required for this claim to survive. The claim therefore cannot be supported via the first of the two asserted "improper means."

That leaves the second asserted improper means. In its response, Plaintiff describes it as "inducing [W.] Martinez to use his close relationship with HCA Healthcare which has developed over many years." (Doc. No. 54 at 19) (quoting Doc. No. 40 at ¶ 57). But the Court finds that to the extent that the claim is based on this alleged improper means, the claim is preempted by TUTSA. In an apparent attempt to have the Court overlook the grounds for preemption that are inherent in the above-quoted sentence from paragraph 57 of the FAC on which it relies, Plaintiff excludes the end of the sentence, which reads (in full) as follows: "inducing [W.] Martinez to use his close relationship with HCA Healthcare which has developed over the years, *and his access to trade secrets and Confidential Information of 3D,* to unfairly compete with 3D." (Doc. No. 40 at ¶ 57) (emphasis added). Although Plaintiff thus tries to make it appear that the claim is based solely on W. Martinez's use of his relationship with HCA Healthcare, the Court is not fooled.

There is nothing "improper" about an employee's merely having had, and thereafter using for the benefit of a new employer, a "close business relationship" with a client developed while working for a former employer. There must be more to it to make it "improper"—and that plainly is where the allegation about trade secrets come in; if there is anything improper about the second alleged improper means (the one quoted just above), it is W. Martinez's misappropriation of trade secrets, and not his mere use of a business relationship that he had developed over the years. Thus, to the extent that Count III is based on the second alleged improper means, the claim does indeed "rise and fall" based on whether Defendants are found to have misappropriated a trade secret and is preempted by TUTSA.

Therefore, the claim in Count III for tortious interference with business relations is dismissed in its entirety, as it fails on the merits to the extent that it is based on the first alleged improper means and is preempted by TUTSA to the extent that it is based on the second alleged improper means.

    d. Count IV

Count IV consists of Plaintiff's claim of civil conspiracy to misappropriate confidential information against all Defendants. Defendants have argued that TUTSA preempts this claim. In its Response, Plaintiff "concedes that Count IV of the FAC does not survive th[e same proof] test and is preempted by TUTSA." (Doc. No. 54 at 14). Plaintiff thereafter requests leave to amend the FAC in order to "seek redress under TUTSA." (*Id.*). The Court declines to grant such a request. Plaintiff has already amended its complaint, and has not correctly moved for leave to amend once more. (*See* Doc. No. 40). The Sixth Circuit has stated that:

> a bare request in an opposition to a motion to dismiss-without any indication of the particular grounds on which amendment is sought … does not constitute a motion within the contemplation of [Fed. R. Civ. P. 15(a)]. A request for leave to amend

almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss … is not a motion to amend.

*Louisiana School Employees' Retirement Sys. v. Ernst & Young, LLP,* 622 F.3d 471 at 486 (6th Cir. 2010) (internal citations omitted). The Court accordingly finds that Plaintiff's request that it "be granted leave to amend the complaint to seek redress under TUTSA," which comprises just a single line and is not accompanied by a proposed (second) amended complaint, does not represent a proper motion to amend the FAC.[18] To that effect, the Court dismisses this claim, as it finds that this claim is preempted (or alternatively has been abandoned) and denies Plaintiff's request to amend the FAC to bring a claim under TUTSA.[19]

---

[18]  As the Sixth Circuit has explained:

> While a district court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), the district court must have before it the substance of the proposed amendment to determine whether "justice so requires." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017). In applying this rule, we have held that a district court does not abuse its discretion where, as here, the plaintiff never sought leave to amend.

*United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 408 (6th Cir. 2018). *See also Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) ("If plaintiffs believe that they need to supplement their complaint with additional facts to withstand a motion for judgment on the pleadings (or a motion to dismiss), they have a readily available tool: a motion to amend the complaint under Rule 15. *See* Fed. R. Civ. P. 15(a). Plaintiffs cannot, by contrast, amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint.").

[19] The Court finds that, in addition to preemption, there is an additional reason to both dismiss this claim and deny Plaintiff's request to amend the FAC. This is because, as the undersigned has previously found, under Tennessee law, "civil conspiracy is not itself a cause of action." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl,* LLC, No. 3:19-CV-00469, 2020 WL 5877131, at *8 (M.D. Tenn. Oct. 2, 2020) (Richardson, J.) (citing *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 849 (M.D. Tenn. 2019) (noting that under Tennessee law, there is no such thing as a cause of action for civil conspiracy); *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999) ("It is well settled in Tennessee that the tort of civil conspiracy requires underlying wrongful conduct, and that conspiracy, standing alone, is not sufficient to support a cause of action.")).

The undersigned has further stated the following:

> Civil conspiracy is, instead, a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort. *See Wachter,* 387 F. Supp. 3d at 849. ("Upon a finding of conspiracy, each conspirator is liable for the damages resulting from the wrongful acts

e.  Count V

Count V consists of Plaintiff's claim of unfair competition against all Defendants. The elements of this claim are: "(1) that the defendant engaged in conduct that amounts to a recognized tort and (2) that tort deprives the plaintiff of customers or other prospects." *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, 2020 WL 5797974, at *8 (M.D. Tenn. Sept. 29, 2020). The FAC does not identify the underlying tort(s) associated with this specific claim. However, in its Response, Plaintiff states that "Defendants' actions were intentionally designed to gain an unfair competitive advantage and to harm 3D by using Confidential Information gained while employed at 3D and [by having W. Martinez and M. Martinez each] violat[e] his agreement to not compete." (Doc. No. 40 at ¶ 68). Plaintiff seemingly tries to argue that there are two bases for the underlying torts in this claim, that of using confidential information (akin to the claim in Count IV) and tortious interference with business relations (akin to the claim in Count III).[20]

_____

of all co-conspirators in carrying out the common scheme." (quoting *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002))). Consistent with its function, a civil conspiracy "'requires an underlying predicate tort allegedly committed pursuant to the conspiracy.'" *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (quoting *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)); *see also Wachter*, 387 F. Supp. 3d at 849. "Conspiracy, standing alone, is not actionable where the underlying tort is not actionable." *Id.* And where the complaint alleges no underlying tort, the civil conspiracy claim has not been validly stated and should be dismissed for failure to state a claim. *Law v. Bioheart Inc.*, No. 07-02177, 2007 WL 9706676, at *2 (W.D. Tenn. July 26, 2007).

*JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl*, LLC, No. 3:19-CV-00469, 2020 WL 5877131, at *8 (M.D. Tenn. Oct. 2, 2020) (Richardson, J.). So, "civil conspiracy" is not a separate claim under Tennessee law—or under Florida law, for that matter. *See Lorillard Tobacco Co. v. Alexander*, 120 So. 3d 67, 80 (Fla. App. 2013) ("Conspiracy is not a separate or independent tort . . ."). This is unlike criminal law, where conspiracy *is* a separate claim (crime); conspiracy is a crime and not just a way of extending, to co-conspirators, liability for an underlying crime committed by one of the conspirators. Accordingly, the Court finds that, even absent preemption, Plaintiff's claim in Count IV would fail because it has not stated a valid cause of action (and that granting leave to amend the FAC to allow for such a claim would be ultimately futile).

[20] As noted, Plaintiff actually does not make clear in its Response which torts constitute the underlying basis for this claim. Instead, Plaintiff merely recites the elements of the claim and states, "For the same

To the extent that the claim is based on the tort outlined in Count IV (civil conspiracy to misappropriate confidential information), the Court finds that this claim is preempted by TUTSA. Plaintiff has conceded that the claim in Count IV is preempted by TUTSA. (Doc. No. 54 at 14). If that claim is preempted, and Count V is based on that claim, it stands to reason that Count V is also preempted by TUTSA. Further, the claim is alternatively without merit because (i) civil conspiracy is absolutely not its own independent tort; and (ii) the alleged object tort of this civil conspiracy (misappropriation of mere confidential information as opposed to *trade secrets*) is not a recognized tort. *Hauck*, 375 F. Supp. 2d at 657 ("If the information is a trade secret, the plaintiff's claim is preempted; if not, the plaintiff has no legal interest upon which to base his or her claim.")

To the extent that the claim is based on the tort outlined in Count III (tortious interference with business relations), the Court finds that this claim fails because as discussed above, Plaintiff has failed to state a valid claim in Count III.

<u>CONCLUSION</u>

For various reasons discussed above, each of the five Counts is subject to dismissal. Therefore, the Motion (Doc. No. 45) will GRANTED in its entirety.

---

reasons discussed above as to Counts II and III, Plaintiff's claim of unfair competition is not preempted by TUTSA because it is not based solely upon Defendants' misappropriation of trade secrets or confidential information." (Doc. No. 54 at 19). The Court has therefore generously construed this statement as arguing that the Court should separate out the different underlying tort claims that could theoretically support this claim and independently analyze them to see whether they are subject to preemption. The Court finds that, although Plaintiff referenced Count II in its Response, the underlying alleged tort of "gain[ing] an unfair competitive advantage . . . to harm 3D by using Confidential Information gained while employed at 3D" maps primarily onto the claim contained within Count IV (civil conspiracy to misappropriate confidential information). (Doc. No. 40 at ¶ 68). The Court also finds that the underlying alleged tort of "using Confidential Information gained while employed at 3D *and violating his agreement not to compete*" maps best on to the claim contained within Count III (tortious interference with business relations) that focuses on the violation of the Restrictive Covenant. (*Id.* at ¶ 68). It goes without saying that the reference to an underlying violation of a non-compete is a reference to a *breach of contract*, not an underlying *tort*.

An appropriate accompanying order will be entered.

_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE